**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **EDGEAQ, LLC,** | § § § | No. 3:14-cv-02264 |
| Plaintiff, | § § | Judge Todd J. Campbell |
| v. | § § | Magistrate Judge E. Clifton Knowles |
| **WTS PARADIGM, LLC,** | § § | **JURY TRIAL DEMANDED** |
| Defendant. | § § § | ▬▬▬▬▬▬▬▬ |

**DEFENDANT'S ANSWER TO THE FIRST AMENDED COMPLAINT,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS FOR NONINFRINGEMENT,
INVALIDITY, AND INEQUITABLE CONDUCT**

Without waiving its pending motion to dismiss for lack of personal jurisdiction or, in the alternative to transfer venue, or in the alternative to dismiss for failure to state a claim (Dkt. No. 57) or its pending motion to stay the proceedings (Dk. No. 59) and in conformity with the April 30, 2015, deadline set in the Court's Case Management Order (Dkt. No. 67 at 5), Defendant WTS Paradigm, LLC ("WTS"), by and through its attorneys, answers the First Amended Complaint as follows:

**INTRODUCTION**

1.   WTS admits that the First Amended Complaint purports to state a claim for patent infringement arising under Title 35 of the United States Code seeking an injunction and damages, but WTS denies that the First Amended Complaint states a valid claim and denies that EdgeAQ, LLC ("EdgeAQ") is entitled to any of its requested relief. WTS admits that the First Amended Complaint purports to state claims for trade secret misappropriation, tortious interference with contractual and business relationships, and procurement of breach of contract,

1

but denies that the First Amended Complaint states any valid claims. WTS admits that the title appearing on the face of U.S. Patent No. 6,810,401 is "Automated Configuration System and Method" and that the title appearing on the face of U.S. Patent No. 7,461,049 is "Automated Configuration System and Method." WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding EdgeAQ's ownership of U.S. Patent Nos. 6,810,401 and 7,461,049, and therefore denies those allegations. WTS denies all other allegations contained in paragraph 1.

2. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2, and therefore denies those allegations.

3. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3, and therefore denies those allegations.

4. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4, and therefore denies those allegations.

5. WTS admits that it is a Wisconsin limited liability company. WTS admits that its former location was at 1600 Aspen Commons, Suite 500, Middleton, WI 53562. WTS denies the remaining allegations in paragraph 5.

6. WTS admits that it may be served via its registered agent. WTS admits that its former location was at 1600 Aspen Commons, Suite 500, Middleton, WI 53562. WTS denies the remaining allegations in paragraph 6.

## JURISDICTION AND VENUE

7. WTS admits that the First Amended Complaint purports to state a claim arising under Title 35 of the United States Code, but denies that the First Amended Complaint states a valid claim. WTS admits that, if proper, a claim arising under Title 35 of the United States Code would arise within the Court's subject matter jurisdiction, but denies that the First Amended

2

Complaint states a valid claim. WTS admits that, if proper, state law claims as alleged in the First Amended Complaint could give rise to this Court's pendant jurisdiction, but denies that the First Amended Complaint states any valid state-law claims. WTS also repeats and re-alleges its position set forth in its motion to dismiss for lack of personal jurisdiction or, in the alternative to transfer venue, or in the alternative to dismiss for failure to state a claim (Dkt. No. 57) and all supporting documentation filed with the motion.

8.    WTS denies the allegations in paragraph 8. WTS also repeats and re-alleges its position set forth in its motion to dismiss for lack of personal jurisdiction or, in the alternative to transfer venue, or in the alternative to dismiss for failure to state a claim (Dkt. No. 57) and all supporting documentation filed with the motion.

9.    WTS admits that, in the past, its website included a map that showed end-users of its software product in the United States, including within Tennessee. WTS denies all other allegations in paragraph 9. WTS also repeats and re-alleges its position set forth in its motion to dismiss for lack of personal jurisdiction or, in the alternative to transfer venue, or in the alternative to dismiss for failure to state a claim (Dkt. No. 57) and all supporting documentation filed with the motion.

### COUNT I
### (ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,810,401)

10.  WTS incorporates its answers in paragraphs 1–9 as if fully set forth herein.

11.  WTS admits that what appears to be U.S. Patent No. 6,810,401 ("the '401 patent") is attached as Exhibit A to the First Amended Complaint. WTS admits that, on its face, Exhibit A states that it was issued on October 26, 2004. WTS denies that EdgeAQ has the right to exclude others and to enforce, sue and record damages for past and future infringement of the '401

3

patent. WTS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 11, and therefore denies those allegations.

12. WTS denies the allegations in paragraph 12.

**ALLEGED DIRECT INFRINGEMENT OF THE '401 PATENT**

13. WTS denies the allegations in paragraph 13.

**ALLEGED INDIRECT INFRINGEMENT OF THE '401 PATENT**
**(ALLEGED INDUCEMENT – 35 U.S.C. § 271(b))**

14. WTS denies the allegations in paragraph 14.

15. WTS admits that it has had knowledge of the '401 patent at least since service or notice of this action. WTS denies all other allegations in paragraph 15.

16. WTS denies the allegations in paragraph 16.

**ALLEGED INDIRECT INFRINGEMENT**
**(ALLEGED CONTRIBUTORY – 35 U.S.C. § 271(c))**

17. WTS denies the allegations in paragraph 17.

18. WTS admits that it has had knowledge of the '401 patent at least since service or notice of this action. WTS denies all other allegations in paragraph 18.

19. WTS denies the allegations in paragraph 19.

20. WTS denies the allegations in paragraph 20.

21. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21, and therefore denies those allegations.

22. WTS denies the allegations in paragraph 22.

23. WTS denies the allegations in paragraph 23.

24. WTS denies the allegations in paragraph 24.

4

## COUNT II
## (ALLEGED INFRINGEMENT OF U.S. PATENT NO. 7,461,049)

25.  WTS incorporates its answers in paragraphs 1–24 as if fully set forth herein.

26.  WTS admits that what appears to be U.S. Patent No. 7,461,049 ("the '049 patent") is attached as Exhibit B to the First Amended Complaint. WTS admits that, on its face, Exhibit B states that it was issued on December 2, 2008. WTS denies that EdgeAQ has the right to exclude others and to enforce, sue and record damages for past and future infringement of the '401 patent. WTS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 26, and therefore denies those allegations.

27.  WTS denies the allegations in paragraph 27.

### ALLEGED DIRECT INFRINGEMENT OF THE '049 PATENT

28.  WTS denies the allegations in paragraph 28.

### ALLEGED INDIRECT INFRINGEMENT
### (ALLEGED INDUCEMENT – 35 U.S.C. § 271(b))

29.  WTS denies the allegations in paragraph 29.

30.  WTS admits that it has had knowledge of the '049 patent at least since service or notice of this action. WTS denies all other allegations in paragraph 30.

31.  WTS denies the allegations in paragraph 31.

### ALLEGED INDIRECT INFRINGEMENT
### (ALLEGED CONTRIBUTORY – 35 U.S.C. § 271(c))

32.  WTS denies the allegations in paragraph 32.

33.  WTS admits that it has had knowledge of the '049 patent at least since service or notice of this action. WTS denies all other allegations in paragraph 33.

34.  WTS denies the allegations in paragraph 34.

35.  WTS denies the allegations in paragraph 35.

5

36. WTS denies the allegations in paragraph 36.

37. WTS denies the allegations in paragraph 37.

38. WTS denies the allegations in paragraph 38.

**COUNT III**
**(ALLEGED VIOLATION OF THE TENNESSEE UNIFORM TRADE SECRETS ACT**
**AND MISAPPROPRIATION OF TRADE SECRETS) (T.C.A. §§ 47-25-1701 et seq.)**

39. WTS incorporates its answers in paragraphs 1–38 as if fully set forth herein.

40. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40, and therefore denies those allegations.

41. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41, and therefore denies those allegations.

42. WTS admits that Exhibit C to the First Amended Complaint contains a title of "Nondisclosure, Noncompetition, and Intellectual Protection Agreement," a date of "May 10, 2005", and a listing of Edgenet, Inc., and Steve Cork as parties. WTS lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 42, and therefore denies those allegations.

43. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43, and therefore denies those allegations.

44. WTS admits that Exhibit C to the First Amended Complaint contains the language quoted in paragraph 44 of the First Amended Complaint. WTS lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 44, and therefore denies those allegations.

45. WTS admits that Exhibit C to the First Amended Complaint contains the language quoted in paragraph 45 of the First Amended Complaint. WTS lacks knowledge or information

6

sufficient to form a belief as to the truth of any remaining allegations in paragraph 45, and therefore denies those allegations.

46. WTS admits that Exhibit C to the First Amended Complaint contains the language quoted in paragraph 46 of the First Amended Complaint. WTS lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 46, and therefore denies those allegations.

47. WTS admits that Exhibit C to the First Amended Complaint contains the language quoted in paragraph 47 of the First Amended Complaint. WTS lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 47, and therefore denies those allegations.

48. WTS admits that Exhibit C to the First Amended Complaint contains the language quoted in paragraph 48 of the First Amended Complaint. WTS lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 48, and therefore denies those allegations.

49. WTS admits that Exhibit C to the First Amended Complaint contains the language quoted in paragraph 49 of the First Amended Complaint. WTS lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 49, and therefore denies those allegations.

50. WTS admits that Exhibit C to the First Amended Complaint contains the language quoted in paragraph 50 of the First Amended Complaint. WTS lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 50, and therefore denies those allegations.

51. WTS admits that Exhibit C to the First Amended Complaint contains the language quoted in paragraph 51 of the First Amended Complaint. WTS lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 51, and therefore denies those allegations.

52. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52, and therefore denies those allegations.

53. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53, and therefore denies those allegations.

54. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54, and therefore denies those allegations.

55. WTS admits that VMH Software provided consulting services to WTS pursuant to written agreement between VMH Software and WTS. WTS admits that Mr. Cork held himself out to WTS as the owner of VMH Software. WTS admits that WTS has sought the business of potential new customers, including the business of The Home Depot, Lowe's, and certain dealers. WTS denies all other allegations in paragraph 55.

56. WTS admits that Mr. Herbst believed that Mr. Cork was a former Edgenet employee at the time VMH Software performed consulting services for WTS. WTS denies all other allegations in paragraph 56.

57. WTS denies the allegations in paragraph 57.

58. WTS denies the allegations in paragraph 58.

59. WTS admits that VMH Software entered into a Mutual Nondisclosure Agreement with WTS dated February 18, 2010. WTS admits that Mr. Cork held himself out to WTS as the owner of VMH Software. WTS admits that Exhibit D to the First Amended Complaint contains a

partially executed version of the Mutual Nondisclosure Agreement. WTS denies the remaining allegations in paragraph 59.

60. WTS admits that WTS and VMH Software entered into a written consulting agreement dated February 23, 2010. WTS admits that Exhibit E to the First Amended Complaint contains a partially executed version of the agreement. WTS denies the remaining allegations in paragraph 60.

61. WTS admits that VMH Software was engaged to provide general advice regarding WTS's strategy for increasing sales. WTS denies the remaining allegations in paragraph 61.

62. WTS admits that VMH Software, pursuant to its consulting agreement with WTS, provided general advice regarding WTS's strategy for increasing sales. WTS denies the remaining allegations in paragraph 62.

63. WTS denies the allegations in paragraph 63.

64. WTS denies the allegations in paragraph 64.

65. WTS admits that VMH Software suggested that WTS modify the Centerpoint graphical user interface to make an end-user's interaction with Centerpoint's graphics more similar to an end-user's interaction with m2o's graphics. WTS denies that it solicited, received, or used Edgenet trade secrets. WTS denies the remaining allegations in paragraph 65.

66. WTS denies the allegations in paragraph 66.

67. WTS denies the allegations in paragraph 67.

68. WTS admits that VMH Software, pursuant to its consulting agreement with WTS, provided general advice regarding pricing strategies. WTS further states that in so providing this advice, VMH Software indicated "All information related to Edgenet (or other competitors) is

9

either available in the public domain and/or is simply this authors opinion." WTS denies the remaining allegations in paragraph 68.

69. WTS denies the allegations in paragraph 69.

70. WTS admits that VMH Software provided general advice regarding potential partners. WTS further states that in so providing this advice, VMH Software indicated "All information related to Edgenet (or other competitors) is either available in the public domain and/or is simply this authors opinion." WTS denies the remaining allegations in paragraph 70.

71. WTS Admits that Mr. Cork attended meetings with WTS personnel on April 13 and 14, 2010, at WTS's office in Middleton, Wisconsin. WTS admits that meetings concerned a general discussion of WTS's strategy for increasing sales. WTS denies the remaining allegations in paragraph 71.

72. WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 regarding whether and when Mr. Cork viewed a demonstration of WTS's software, and therefore denies those allegations. WTS denies the remaining allegations in paragraph 72.

73. WTS denies the allegations in paragraph 73.

74. WTS admits that WTS is accused of infringing the '049 and '401 patents in the First Amended Complaint, but denies any such infringement. WTS admits that the '049 and '401 patents disclose "frames" and "slots." WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 regarding the m2o software, and therefore denies those allegations.

75. WTS denies the allegations in paragraph 75.

76. WTS denies the allegations in paragraph 76.

77.  WTS denies the allegations in paragraph 77.

78.  WTS denies the allegations in paragraph 78.

79.  WTS denies the allegations in paragraph 79.

80.  WTS denies the allegations in paragraph 80.

81.  WTS denies the allegations in paragraph 81.

82.  WTS denies the allegations in paragraph 82.

83.  WTS denies the allegations in paragraph 83.

84.  WTS denies the allegations in paragraph 84.

85.  WTS lacks knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 85 regarding the purported timing of EdgeAQ learning the alleged facts in paragraphs 55 through 83 of the First Amended Complaint. WTS admits that Exhibit F to the First Amended Complaint appears to be a Declaration of Stephen Cork, dated January 20, 2015.

86.  WTS denies the allegations in paragraph 86.

87.  WTS denies the allegations in paragraph 87.

88.  WTS denies the allegations in paragraph 88.

89.  WTS denies the allegations in paragraph 89.

**COUNT IV**
**(ALLEGED TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS) (Common Law)**

90.  WTS incorporates its answers in paragraphs 1–89 as if fully set forth herein.

91.  WTS denies the allegations in paragraph 91.

92.  WTS denies the allegations in paragraph 92.

93.  WTS denies the allegations in paragraph 93.

11

## COUNT V
## (ALLEGED PROCUREMENT OF BREACH OF CONTRACT) (T.C.A. § 47-50-109)

94. WTS incorporates its answers in paragraphs 1–93 as if fully set forth herein.

95. WTS denies the allegations in paragraph 95.

## COUNT VI
## (REQUEST FOR AWARD OF ATTORNEY'S FEES)

96. WTS incorporates its answers in paragraphs 1–95 as if fully set forth herein.

97. WTS denies the allegations in paragraph 97.

98. WTS denies the allegations in paragraph 98.

## RESPONSE TO EDGEAQ'S PRAYER FOR RELIEF

WTS denies that EdgeAQ is entitled to any relief whatsoever from WTS, including without limitation the relief requested in the First Amended Complaint's Prayer for Relief. WTS further denies the allegations in sub-paragraphs A-K of the First Amended Complaint's Prayer for Relief.

## RESPONSE TO EDGEAQ'S DEMAND FOR JURY TRIAL

WTS hereby demands trial by jury for all issues so triable.

## WTS'S AFFIRMATIVE DEFENSES

Without assuming any burden that it would not otherwise bear, and specifically reserving its right to assert additional affirmative defenses as additional information becomes available through discovery or otherwise, WTS asserts the following affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE
### (Lack of Personal Jurisdiction)

99. WTS is not subject to this Court's specific or general personal jurisdiction under any authority, including the Tennessee Long Arm Statute or principles of due process.[1]

## SECOND AFFIRMATIVE DEFENSE
### (Non-Infringement)

100. WTS does not infringe and has not infringed under any theory (including directly, jointly, contributorily, or by inducement) any valid and enforceable claim of the '401 and '049 patents ("Asserted Patents"), either literally or under the doctrine of equivalents.

## THIRD AFFIRMATIVE DEFENSE
### (Invalidity)

101. The claims of the Asserted Patents are invalid because they fail to satisfy one or more of the conditions for patentability specified in Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

## FOURTH AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel)

102. EdgeAQ is estopped, based on statements, representations, and admissions made during the prosecution of the patent applications resulting in the Asserted Patents from asserting that WTS has infringed, directly or indirectly, any claim of the Asserted Patents, either literally or under the doctrine of equivalents.

---

[1] This Court does not have personal jurisdiction over WTS for the reasons articulated in WTS's briefs in support of its Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to F.R.C.P. 12(b)(2) or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404(A). (Dkt. Nos. 57, 58, 75.) WTS maintains its objection based on lack of personal jurisdiction. Likewise, to the extent the Court determines that it has personal jurisdiction over WTS, WTS maintains that this action, including all claims and counterclaims, should nonetheless be transferred to the Western District of Wisconsin. WTS files this pleading solely to comply with the Case Management Order entered by this Court. (Dkt. No. 67 at 5.) This pleading is not an admission that this Court has personal jurisdiction over WTS or an acquiescence to any such purported personal jurisdiction. Nor is it an admission that venue in this judicial district is proper; nor is it acquiesce to such venue.

## FIFTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

103. EdgeAQ has failed to state a claim upon which relief can be granted.

## SIXTH AFFIRMATIVE DEFENSE
### (Preemption)

104. EdgeAQ's tortious interference and procurement of breach of contract claims are preempted by statutory trade secret law.

## SEVENTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

105. On information and belief, EdgeAQ lacks the right to enforce the Cork Nondisclosure Agreement.

106. EdgeAQ lacks standing to bring its tortious interference and procurement of breach of contract claims.

## EIGHTH AFFIRMATIVE DEFENSE
### (Failure to Join Indispensible Party)

107. On information and belief, EdgeAQ does not own all rights in the Asserted Patents due to incorrect inventorship, including for the omission of Roy Riggs or David Rawle.

108. EdgeAQ does not have standing to bring its patent infringement claims.

## NINTH AFFIRMATIVE DEFENSE
### (Laches, Estoppel, and Waiver)

109. EdgeAQ's claims are barred by the doctrines of laches, estoppel and/or waiver.

## TENTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

110. EdgeAQ's claims are barred by applicable statutes of limitation.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Statutory Damages Limitations)

111. EdgeAQ's recovery for alleged infringement of the Asserted Patents, if any, is limited by Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 286 and 287.

## TWELFTH AFFIRMATIVE DEFENSE
### (Unavailability of Injunctive Relief)

112. EdgeAQ is not entitled to injunctive relief (temporarily, preliminarily, or permanently), because any injury to it is not immediate or irreparable, EdgeAQ would have an adequate remedy at law, the balance of hardships favors no injunction, and the public interest is best served by no injunction.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Unenforceability)

113. EdgeAQ's claims as they relate to the Asserted Patents are barred in whole or in part by reason of inequitable conduct before the United States Patent and Trademark Office ("PTO").

114. The Asserted Patents each list Joseph H. Thompson, Randy J. Weems, and Edward A. Lessman as inventors.

115. The Asserted Patents each list Edgenet Inc. as the assignee. During the prosecution of the Asserted Patents, Mr. Thompson, Mr. Weems, and Mr. Lessman were employees of Edgenet Inc. or its predecessor. During the prosecution of the Asserted Patents, Timothy Choate was an executive at Edgenet Inc. and its predecessor.

116. Software developed, sold, and offered for sale by Edgenet Inc.'s predecessor during and before June 1998 (as well as similar software sold between June 1998 and October 1999) represented an on-sale and public-use bar to patentability under 35 U.S.C. 102(b).

15

117. At all times during the prosecution of the Asserted Patents, Mr. Thompson, Mr. Weems, Mr. Lessman, Mr. Choate, and Edgenet withheld information related to this software from the PTO even though, on information and belief, they knew that the information was material to the prosecution of the Asserted Patents. On information and belief, they withheld it with the specific intent to deceive the PTO.

118. EdgeAQ is Edgenet Inc.'s successor. Mr. Lessman is employed by EdgeAQ. Mr. Choate sits on EdgeAQ's board of directors. Mr. Thompson has a consulting agreement with EdgeAQ. On information and belief, Mr. Weems is deceased.

**The EPIC Software Practiced the Claims of the Asserted Patents**

119. Mr. Thompson was founder and chief executive officer of Electronic Product Information Corp. ("EPIC"). Mr. Weems and Mr. Lessman were employed as software engineers at EPIC.

120. EPIC designed, sold, and offered for sale a software system for product configuration or selection ("EPIC software").

121. The EPIC software is described by Exhibits 1–5.

122. Exhibit 1 is a true and correct copy of a document produced by Mr. Thompson in this litigation identified as THOMP000007371–7376, titled EPIC's Response to the Technical Requirements Document for the ███████████████ Configurator, and dated February 20, 1997.

123. Exhibit 2 is a true and correct copy of a document produced by Mr. Thompson in this litigation identified as THOMP000000691–747, which is a book of information that was provided to ████████████████████ in or around February 1997, including the following documents: EPIC Project Procedures, Electronic Information System Survey, System Functional Descriptions, ████████████████ System Functionality & Fees Decision Matrix, and Agreement for ████████████████.

16

124. Exhibit 3 is a true and correct copy of a document produced by Mr. Thompson in this litigation identified as THOMP000000780–805, which is a book of information about the EPIC software as of June 1998, including the following documents: Company Profile; EPIC Technology Applications for Product Configuration, Specification & Selection; EPIC Demo System Workbook; and EPIC Selected Client & Distributed Applications Listing.

125. Exhibit 4 is a true and correct copy of a document produced by Mr. Thompson in this litigation identified as THOMP000004504–4506, which is a Functionality & Fees Decision Matrix sent to ███████████████ in April of 1998.

126. Exhibit 5 is a true and correct copy of a document produced by Mr. Thompson in this litigation identified as THOMP000007718, which is a letter sent from EPIC to ██████ ███████████ in April of 1998 that enclosed the Functionality & Fees Decision Matrix.

127. The EPIC software practiced every claim of the Asserted Patents by at latest June 1998.

128. For a first example, the EPIC software had each limitation of claim 1 of the '049 patent.

129. Claim 1 of the '049 patent claims "A configuration system comprising: a processor; a user interface, wherein said user interface receives input data for a desired configuration; and a frame engine, receiving data input from said user interface, wherein said frame engine outputs configuration data to said user interface in response to a frame-based inference of the input data by examination of a hierarchical data tree structure having nodes whose components contain data relevant to various configurations and by removing appropriate portions of the data tree structure from consideration as input data is received for a desired configuration."

17

130. The EPIC software is a configuration system. This is disclosed, for example, at Ex. 1 at 7371 and Ex. 3 at 782. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

131. The EPIC software includes a processor. This is disclosed, for example, at Ex. 2 at 726 and Ex. 3 at 795. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

132. The EPIC software includes a user interface, wherein said user interface received input data for a desired configuration. This is disclosed, for example, at Ex. 2 at 699 and Ex. 3 at 784. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

133. The EPIC software includes a frame engine, receiving data input from said user interface, wherein said frame engine outputs configuration data to said user interface in response to a frame-based inference of the input data by examination of a hierarchical data tree structure having nodes whose components contain data relevant to various configurations and by removing appropriate portions of the data tree structure from consideration as input data is received for a desired configuration. This is disclosed, for example, at Ex. 1 at 7373, 7376; Ex. 2 at 699; and Ex. 3 at 783–785, 788, 790–791. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

134. For a second example, the EPIC software had each limitation of claim 6 of the '401 patent.

135. Claim 6 of the '401 patent claims "A product configuration system for configuring products from a plurality of product components based on user interaction, the system comprising: a user interface, wherein said user interface receives answers from the user corresponding to questions output to the user in the form of a display of graphical and textual

representations; a graphics formatting and output subsystem, wherein said graphics formatting and output subsystem performs calculations and preparations for the display of graphical and textual representations to said user interface; a data storage subsystem, wherein said data storage subsystem is a repository of product information representing knowledge of product components including type, style, size, and attributes; a configurator subsystem, wherein said configurator subsystem builds product configurations based on data from said data storage subsystem and established data relationships, wherein said configurator includes a core module for facilitating input and output data in the system, and a frame engine for computing available configuration answers for any configuration questions posed to the user at any time, wherein the frame engine is a frame-based expert system, the frame engine receiving values of answers, including answers related to desired product component attributes, as received by said user interface and performing frame-based inferences of the values of answers to other questions automatically, and generating configuration data representing configuration of a desired product based on the inferences made; and a data analysis subsystem, wherein said data analysis subsystem accesses and processes data from said data storage subsystem, and wherein said data analysis subsystem includes a pricing engine that uses the configuration data generated by the frame engine to generate pricing for the desired product."

136. The EPIC software is a product configuration system for configuring products from a plurality of product components based on user interaction. This is disclosed, for example, at Ex. 1 at 7371 and Ex. 3 at 782, 784. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

137. The EPIC software includes a user interface, wherein said user interface receives answers from the user corresponding to questions output to the user in the form of a display of

19

graphical and textual representations. This is disclosed, for example, at Ex. 2 at 699, 702; and Ex. 3 at 782, 784. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

138. The EPIC software includes a graphics formatting and output subsystem, wherein said graphics formatting and output subsystem performs calculations and preparations for the display of graphical and textual representations to said user interface. This is disclosed, for example, at Ex. 2 at 699, 702, 726; and Ex. 3 at 782, 784. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

139. The EPIC software includes a data storage subsystem, wherein said data storage subsystem is a repository of product information representing knowledge of product components including type, style, size, and attributes. This is disclosed, for example, at Ex. 1 at 7371, 7372, 7373; Ex. 2 at 699; and Ex. 3 at 782, 785.

140. The EPIC software includes a configurator subsystem, wherein said configurator subsystem builds product configurations based on data from said data storage subsystem and established data relationships, wherein said configurator includes. This is disclosed, for example, at Ex. 1 at 7373. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

141. The EPIC software includes a core module for facilitating input and output data in the system. This is disclosed, for example, at Ex. 1 at 7372 and Ex. 3 at 784, 785. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

142. The EPIC software includes a frame engine for computing available configuration answers for any configuration questions posed to the user at any time, wherein the frame engine is a frame-based expert system. This is disclosed, for example, at Ex. 1 at 7373; Ex. 2 at 699; and

Ex. 3 at 783, 784, 790. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

143. The EPIC software's frame engine receives values of answers, including answers related to desired product component attributes, as received by said user interface and performs frame-based inferences of the values of answers to other questions automatically. This is disclosed, for example, at Ex. 1 at 7371, 7373; Ex. 3 at 788. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

144. The EPIC software generates configuration data representing configuration of a desired product based on the inferences made. This is disclosed, for example, at Ex. 2 at 699, 709; Ex. 3 at 782. Further, while under oath, Mr. Thompson confirmed the EPIC software had this limitation.

145. The EPIC software includes a data analysis subsystem, wherein said data analysis subsystem accesses and processes data from said data storage subsystem, and wherein said data analysis subsystem includes a pricing engine that uses the configuration data generated by the frame engine to generate pricing for the desired product. This is disclosed, for example, at Ex. 1 at 7374–75, 7376; Ex. 2 at 708; Ex. 3 at 785.

146. Through their work at EPIC, Mr. Thompson, Mr. Lessman, and Mr. Weems were knowledgeable about the design, operations, features, and functionality of the EPIC software.

**The EPIC Prior Art System Was On Sale And In Public Use Before June 1998**

147. The EPIC software was on sale and in public use during and before June 1998.

148. The EPIC software was on sale to ████████████ in or around February 1997. For example, Exhibit 1 shows this.

149. The EPIC software was on sale to ████████████████████████ in or around February 1997. For example, Exhibit 2 shows this.

150. The EPIC software was on sale by June 1998. Exhibit 3 shows this.

151. The EPIC software was on sale to ████████████████ in or around April 1998. For example, Exhibits 4 and 5 show this.

152. The EPIC software was in public use by EPIC's clients by June 1998. This is shown by the listing of EPIC clients included in Exhibit 3.

153. While under oath, Mr. Thompson confirmed that the EPIC software was on sale and in public use by June 1998. For example, Mr. Thompson testified that EPIC had sold the EPIC software or offered it for sale to ████████████████████████████████ ████████████████████████████████.

154. Through their work at EPIC, Mr. Thompson, Mr. Lessman, and Mr. Weems were knowledgeable about the sales, offers for sale, and public uses of the EPIC software.

### Edgenet's Acquisition of EPIC

155. In June 1998, Edgenet Media LLC acquired the assets of EPIC. This acquisition included the rights in the EPIC software.

156. Edgenet Media LLC became Edgenet Inc. by 2000 (hereinafter, Edgenet Media LLC and Edgenet Inc. are collectively "Edgenet").

157. After the acquisition, Edgenet sold and offered for sale software that was materially the same as the EPIC software under the names "made2order" and "m2o." The software sold by Edgenet in the 16 months following Edgenet's acquisition of EPIC contained all the features of the EPIC software as it existed in June 1998.

158. The design, operations, features, functionality, sales, offers for sale, and public uses of the EPIC software (and that of the successor software) were known to various employees and executives at Edgenet by October 8, 1999.

159. EPIC personnel began working at Edgenet after Edgenet's June 1998 acquisition of EPIC, including Mr. Thompson, Mr. Weems, Mr. Lessman, and Roy Riggs.

160. Edgenet personnel, including Mr. Choate, became familiar with design, operations, features, functionality, sales, offers for sale, and public uses of the EPIC software via an alliance between EPIC and Edgenet that began in 1996, via Edgenet's diligence on EPIC leading up to the acquisition, and via Edgenet's subsequent ownership of the EPIC software.

**Edgenet's Inequitable Patenting of the Technology Embodied by the EPIC Software**

161. By October 1999, Edgenet executives determined that patent protection on the technology embodied in the EPIC software was a strategic necessity. For example, Mr. Thompson testified under oath that ████████████████████████████ ███████████████████████████████████████████

162. On October 8, 1999, Edgenet filed Provisional Application Nos. 60/158,250 and 60/158,316 (collectively, "the Provisional Applications"). On October 10, 2000, Edgenet filed Application No. 09/684,907, which claimed priority to the Provisional Applications and ultimately issued as the '401 patent on October 26, 2004. On September 25, 2003, Edgenet filed Application No. 10/669,465, which claimed priority to Application No. 09/684,907 and the Provisional Applications and ultimately issued as the '049 patent on December 2, 2008.

163. The Asserted Patents each list Mr. Thompson, Mr. Weems, and Mr. Lessman as inventors.

164. The Asserted Patents each list Edgenet as the assignee. Mr. Choate was an executive at Edgenet during the prosecution of the Asserted Patents and was the person within Edgenet responsible for overseeing the prosecution of the Asserted Patents.

165. Mr. Thompson, Mr. Weems, and Mr. Lessman were each aware of his duty to disclose information material to the patentability of the inventions claimed in the applications

23

that led to the Asserted Patents. For example, on October 10, 2000, each signed a declaration in conjunction with these applications stating, "I acknowledge the duty to disclose to the United States Patent and Trademark Office all information known to me to be material to patentability as defined in Title 37, Code of Federal Regulations, Section 1.56."

166. Mr. Choate was aware of his and Edgenet's duty to disclose information material to the patentability of the inventions claimed in the applications that led to the Asserted Patents. Mr. Choate is a named inventor on one of the Provisional Applications. Furthermore, Mr. Choate worked with the named inventors internally at Edgenet to prepare the patent applications and, on information and belief, with Edgenet's outside patent attorneys—including those at Dickstein Shapiro Morin & Oshinsky LLP—who, on information and belief, informed him of the duty to disclose.

167. Edgenet was aware of its duty to disclose, its employees' duty to disclose, and the inventors' duty to disclose information material to the patentability of the inventions claimed in the applications that led to the Asserted Patents. For example, its executives were aware of the duty, including Mr. Thompson and Mr. Choate.

168. Prior to and during the prosecution of the Asserted Patents, Mr. Thompson was aware of the existence of the documents attached to this pleading as Exhibits 1–5.

169. Prior to and during the prosecution of the Asserted Patents, Mr. Weems and Mr. Lessman authored at least portions of Exhibits 1–4 or documents created before October 8, 1998, with substantially the same disclosures as Exhibits 1–4.

170. On information and belief, prior to and during the prosecution of the Asserted Patents, Mr. Thompson, Mr. Weems, Mr. Lessman, and Mr. Choate were each aware of the

existence of documents created before October 8, 1998, with substantially the same disclosures as Exhibits 1–5.

171. Prior to and during the prosecution of the Asserted Patents, Mr. Thompson was aware that by June 1998 the EPIC software practiced at least one claim of each Asserted Patent, including Claim 1 of the '049 patent and Claim 6 of the '401 patent.

172. On information and belief, prior to and during the prosecution of the Asserted Patents, Mr. Weems, Mr. Lessman, and Mr. Choate were each aware that by June 1998 the EPIC software practiced at least one claim of each Asserted Patent, including Claim 1 of the '049 patent and Claim 6 of the '401 patent.

173. On information and belief, to the extent either Mr. Thompson, Mr. Weems, Mr. Lessman, or Mr. Choate had any doubt about whether Exhibits 1–4 (or documents known to him with substantially the same disclosures as Exhibits 1–4) disclosed every limitation of at least one claim of each Asserted Patent (including Claim 1 of the '049 patent and Claim 6 of the '401 patent), he was aware that Exhibits 1–4 (or documents known to him with substantially the same disclosures as Exhibits 1–4) disclosed *nearly* every limitation of at least one claim of each Asserted Patent (including Claim 1 of the '049 patent and Claim 6 of the '401 patent).

174. On information and belief, to the extent either Mr. Thompson, Mr. Weems, Mr. Lessman, or Mr. Choate had any doubt about whether by June 1998 the EPIC software included every limitation of at least one claim of each Asserted Patent (including Claim 1 of the '049 patent and Claim 6 of the '401 patent), he was aware that the EPIC software practiced *nearly* every limitation of at least one claim of each Asserted Patent (including Claim 1 of the '049 patent and Claim 6 of the '401 patent).

175. At no point during the prosecution of the Asserted Patents did Mr. Thompson, Mr. Weems, Mr. Lessman, Mr. Choate, or Edgenet disclose to the PTO the existence of Exhibits 1–4 or documents with substantially the same disclosures as Exhibits 1–4. At no point during the prosecution of the Asserted Patents did Mr. Thompson, Mr. Weems, Mr. Lessman, Mr. Choate, or Edgenet disclose to the PTO that the EPIC software that was on sale or in public use before October 7, 1999, included every limitation of at least one claim of each Asserted Patent (including Claim 1 of the '049 patent and Claim 6 of the '401 patent). At no point during the prosecution of the Asserted Patents did Mr. Thompson, Mr. Weems, Mr. Lessman, Mr. Choate, or Edgenet disclose to the PTO that the EPIC software that was on sale or in public use before October 7, 1999, included nearly every limitation of at least one claim of each Asserted Patent (including Claim 1 of the '049 patent and Claim 6 of the '401 patent).

176. On information and belief, Mr. Thompson, Mr. Weems, Mr. Lessman, Mr. Choate, and Edgenet each knew this information was material to the patentability of the Asserted Patents because it disclosed that the EPIC software anticipated or nearly anticipated at least one claim of each Asserted Patent (including Claim 1 of the '049 patent and Claim 6 of the '401 patent).

177. On information and belief, Mr. Thompson, Mr. Weems, Mr. Lessman, Mr. Choate, and Edgenet withheld this information with the specific intent to deceive the PTO. This is supported by, among other things, (1) the fact that they knew about the EPIC software and its materiality, (2) their desire to have the applications issue as a patents, as evidenced by Mr. Thompson's testimony that Edgenet clearly needed patent protection as it expanded its business.

178. As a result, EdgeAQ's claims as they relate to the Asserted Patents are barred in whole or in part by reason of inequitable conduct before the PTO.

26

## WTS'S COUNTERCLAIMS

Without waiving its pending motion to dismiss for lack of personal jurisdiction or, in the alternative to transfer venue, or in the alternative to dismiss for failure to state a claim (Dkt. No. 57) or its pending motion to stay the proceedings (Dk. No. 59) and in conformity with the April 30, 2015, deadline set in the Court's Case Management Order (Dkt. No. 67 at 5), Defendant/Counterclaimant WTS Paradigm, LLC ("WTS") hereby states the following allegations and counterclaims against Plaintiff/Counterclaim Defendant EdgeAQ, LLC ("EdgeAQ"), and demands a trial by jury on its non-equitable claims:

### Nature of the Action and Relief Sought

1.  WTS repeats and re-alleges each paragraph in WTS's Answer and Affirmative Defenses to the First Amended Complaint.

2.  This is an action to declare U.S. Patent No. 6,810,401 ("the '401 Patent") and U.S. Patent No. 7,461,049 ("the '049 Patent") (collectively, the "Asserted Patents") not infringed by WTS, invalid, and/or unenforceable.

### Parties

3.  On information and belief, EdgeAQ is a Delaware limited liability company having its principal place of business at 6 Cadillac Drive, Suite 405, Brentwood, TN 37027.

4.  On information and belief, EdgeAQ maintains an office with approximately half of its employees at N14W24200 Tower Place, Suite 100, Waukesha, WI 53188.

5.  WTS is a Wisconsin limited liability company with its principal place of business at 1850 Deming Way, Suite 120, Middleton, WI 53562.

### Jurisdiction and Venue

6.  This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq*. and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

7. This Court has jurisdiction over these counterclaims under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

8. To the extent this Court determines venue is appropriate for EdgeAQ's claims in this litigation, venue for these counterclaims is appropriate pursuant to 28 U.S.C. § 1391 and 1400(b).[2]

9. EdgeAQ has consented to personal jurisdiction by commencing this litigation in this judicial district, as set forth in its First Amended Complaint.

## Factual Background

10. By filing its First Amended Complaint, EdgeAQ has purported to assert a claim against WTS for the alleged infringement of the '401 patent. WTS has not infringed, contributed to the infringement of, or induced the infringement of any valid, enforceable claim of the '401 patent. Consequently, an actual controversy exists between the parties with respect to the infringement, validity, and enforceability of the '401 patent.

11. By filing its First Amended Complaint, EdgeAQ has purported to assert a claim against WTS for the alleged infringement of the '049 patent. WTS has not infringed, contributed to the infringement of, or induced the infringement of any valid, enforceable claim of the '049 patent. Consequently, an actual controversy exists between the parties with respect to the infringement, validity, and enforceability of the '049 patent.

---

[2] This Court does not have personal jurisdiction over WTS for the reasons articulated in WTS's briefs in support of its Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to F.R.C.P. 12(b)(2) or, in the Alternative, to Transfer Pursuant to 28 U.S.C. § 1404(A). (Dkt. Nos. 57, 58, 75.) WTS maintains its objection based on lack of personal jurisdiction. Likewise, to the extent the Court determines that it has personal jurisdiction over WTS, WTS maintains that this action, including all claims and counterclaims, should nonetheless be transferred to the Western District of Wisconsin. WTS files this pleading solely to comply with the Case Management Order entered by this Court. (Dkt. No. 67 at 5.) This pleading is not an admission that this Court has personal jurisdiction over WTS or an acquiescence to any such purported personal jurisdiction. Nor is it an admission that venue in this judicial district is proper; nor is it acquiesce to such venue.

Case 3:14-cv-02264   Document 97   Filed 05/26/15   Page 28 of 33 PageID #: 2396

**Counterclaim 1—Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,810,401**

12. WTS re-alleges and incorporates the allegations of the foregoing paragraphs of the Counterclaims as though fully set forth herein.

13. WTS has not and is not now infringing, directly or indirectly, or contributed to infringement by another, or actively induced others to infringe any valid or enforceable claim of the '401 patent. WTS is not liable for any infringement, literally or under the doctrine of equivalents, of the '401 patent.

14. As a result, WTS is entitled to a judgment finding that the '401 patent is not infringed by WTS, either literally or under the doctrine of equivalents, and that WTS has not contributed to or induced any infringement by another.

**Counterclaim 2—Declaratory Judgment of Invalidity of U.S. Patent No. 6,810,401**

15. WTS re-alleges and incorporates the allegations of the foregoing paragraphs of the Counterclaims as though fully set forth herein.

16. Each and every claim of the '401 patent is invalid for failure to comply with the conditions and requirements of patentability set forth in the patent statutes, including without limitation 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

17. WTS is therefore entitled to declaratory judgment that each and every claim of the '401 patent is invalid.

**Counterclaim 3—Declaratory Judgment of Unenforceability of U.S. Patent No. 6,810,401**

18. WTS re-alleges and incorporates the allegations of the foregoing paragraphs of the Counterclaims as though fully set forth herein.

19. Each and every claim of the '401 patent is unenforceable due to the inequitable conduct of Mr. Thompson, Mr. Weems, Mr. Lessman, Mr. Choate, and Edgenet before the PTO.

20. WTS is therefore entitled to declaratory judgment that each and every claim of the '401 patent is unenforceable.

**Counterclaim 4—Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,461,049**

21. WTS re-alleges and incorporates the allegations of the foregoing paragraphs of the Counterclaims as though fully set forth herein.

22. WTS has not and is not now infringing, directly or indirectly, or contributed to infringement by another, or actively induced others to infringe any valid or enforceable claim of the '049 patent. WTS is not liable for any infringement, literally or under the doctrine of equivalents, of the '049 patent.

23. As a result, WTS is entitled to a judgment finding that the '049 patent is not infringed by WTS, either literally or under the doctrine of equivalents, and that WTS has not contributed to or induced any infringement by another.

**Counterclaim 5—Declaratory Judgment of Invalidity of U.S. Patent No. 7,461,049**

24. WTS re-alleges and incorporates the allegations of the foregoing paragraphs of the Counterclaims as though fully set forth herein.

25. In addition, each and every claim of the '049 patent is invalid for failure to comply with the conditions and requirements of patentability set forth in the patent statutes, including without limitation 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

26. WTS is therefore entitled to declaratory judgment that each and every claim of the '049 patent is invalid.

**Counterclaim 6—Declaratory Judgment of Unenforceability of U.S. Patent No. 7,461,049**

27. WTS re-alleges and incorporates the allegations of the foregoing paragraphs of the Counterclaims as though fully set forth herein.

28. In addition, each and every claim of the '049 patent is unenforceable due to the inequitable conduct of Mr. Thompson, Mr. Weems, Mr. Lessman, Mr. Choate, and Edgenet before the PTO.

29. WTS is therefore entitled to declaratory judgment that each and every claim of the '049 patent is unenforceable.

## Exceptional Case

30. This case is an exceptional case entitling WTS to an award of its reasonable attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285, as a result of, inter alia, EdgeAQ's assertion of the Asserted Patents against WTS with the knowledge that the Asserted Patents are not infringed and/or are invalid and unenforceable.

## Prayer for Relief

WHEREFORE, WTS prays for the following relief:

A. Dismissal of EdgeAQ's First Amended Complaint with prejudice and entry of judgment in favor of WTS;

B. Judgment declaring that WTS has not and does not infringe, under any theory, any claim of the Asserted Patents;

C. Judgment declaring that each and every claim of the Asserted Patents is invalid and/or unenforceable;

D. Judgment that this is an exceptional case pursuant to 35 U.S.C. § 285 or otherwise, and an award to WTS of its reasonable attorneys' fees and expenses;

E. Such other and further relief as this Court may deem just and proper.

## Jury Demand

WTS hereby demands a trial by jury on all issues triable by a jury alleged or relating to this litigation pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated this 30th day of April, 2015.

/s/ Anthony A. Tomaselli
Anthony A. Tomaselli (*pro hac vice*)
aat@quarles.com
Kristin Graham Noel (*pro hac vice*)
kgn@quarles.com
Martha Jahn Snyder (*pro hac vice*)
martha.snyder@quarles.com
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Tel.: 608.251.5000
Fax: 608.251.9166

Louis A. Klapp (*pro hac vice*)
Louis.Klapp@quarles.com
QUARLES & BRADY LLP
300 North LaSalle Street, Suite 4000
Chicago, IL 60654
Tel: 312-715-2712
Fax: 312-632-194

William L. Campbell, Jr. (BPR 22712)
FROST BROWN TODD LLC
150 3rd Avenue South, Suite 1900
Nashville, TN 37201
(615) 251-5550
ccampbell@fbtlaw.com

*Counsel for WTS Paradigm, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2015, I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.


Dated: May 26, 2015                    */s/ Anthony A. Tomaselli*